[No. 5091.   Decided December 19, 1904.]

FRANK PHINNEY, *Appellant,* v. THE STATE OF WASH-INGTON, *on the Relation of W. B. Stratton, Attorney General, Respondent.*[1]

GIFTS—MORTIS CAUSA—VALIDITY—CHECK ON BANK.  Where the deceased in his last sickness gave to his friend a check upon his bank in another town for nearly all of his estate, with the understanding that the gift was to be revoked in case of his recovery, and directed that the same be mailed to the bank, the same constitutes a valid gift *mortis causa* although owing to a misdelivery the check did not reach the bank until after the death of the donor, especially where there is no controversy with creditors or subsequent donees or assigns.

[1]Reported in 78 Pac. 927.

SAME—CONSTRUCTIVE DELIVERY—ASSIGNMENT OF FUNDS IN BANK—INTENT. In such a case, the fact that a check on a bank does not ordinarily constitute an assignment of the fund does not prevent the same from being a constructive delivery, as the subject of the gift was not available, and great latitude ought to be given to carry out the intent of the donor, where there is no contest with creditors.

Appeal from a judgment of the superior court for Skagit county, Joiner, J., entered November 16, 1904, upon findings in favor of the state, as intervenor and claimant, upon the final settlement of an estate, after overruling a demurrer to the complaint in intervention and a trial upon the merits before the court without a jury. Reversed.

*Million & Houser,* for appellant.

*J. C. Waugh,* for respondent.

DUNBAR, J.—The following is the appellant's presentation of the facts in this case, which an examination of the record has proven to be substantially correct: The decedent, John W. Collins, and appellant, Frank Phinney, had been friends for some time prior to Collins' death. Some two weeks before his death, Collins was taken sick at Anacortes, and was attended by appellant as nurse and companion. On the 12th day of February, 1902, Collins and appellant left Anacortes for Harrison Hot Springs, B. C., with the intention of benefitting Collins' health. They arrived at the Springs on the following day, where they remained until Collins' death. During all of this time appellant was acting as companion and nurse to Collins. Shortly after their arrival at the Springs, Collins was placed under the care of Dr. Elliott, who treated him up to the time of his death.

On or about the 22nd day of February decedent had a very severe hemorrhage of the stomach, from the effects

of which he seems to have gradually failed, until his death, which occurred on the 27th of February. Shortly after the hemorrhage, Collins requested appellant to go to the office and get a pen and ink, stating that he desired to write a check. About the time the appellant returned with pen and ink, Dr. Elliott had also returned to his patient, and appellant declining to write out the check and insisting that the deceased ought not to disturb himself at that time, the doctor was requested to write it, and, at Collins' dictation, a check was drawn up in favor of Frank Phinney, on the bank of LaConner, for the sum of $4,000. The check was then handed to appellant with a statement by Collins that, "If I don't get over this I want Frank to get my money; I don't want it to go to Skagit county." The statement also shows that the gift was to be revoked in case Collins got well. Collins then directed apppellant to forward a letter to the bank at LaConner, containing the check, and, at the same time, wrote a letter to the bank himself, inclosing his pass-book, and directing the bank to balance his book and return it to him. He then directed appellant to address both letters and mail them, which was done the following morning, February 27th. The letter containing the pass-book was received by the bank of LaConner on the 25th day of February, and the pass-book was balanced on that day and returned to Collins. The letter containing the check was miscarried to LaCombe, B. C., and, by reason of that fact, did not reach the bank at LaConner until March 3rd, some five or six days after Collins' death. The bank, having been apprised of Collins' death, refused to honor the check when it arrived.

Collins died intestate, and left no wife, heirs or next of kin, and no creditors. Appellant was duly appointed administrator of the estate, notice to creditors was duly

given, and an inventory filed as required by law, in which all the personal property of decedent was included. The $4,000 covered by the check was not included in the inventory, or treated in any of the proceedings as an asset of the estate, but was at all times claimed by said Phinney as his own personal property by virtue of the gift from Collins. On the 10th day of July, 1903, appellant filed his final account, and asked that his acts be approved, and that he be discharged. At the time for hearing the final account and application to be discharged, the case was continued, and the state intervened, claiming the $4,000 as an escheat to the state of Washington for the benefit of the common schools. The motion to strike said intervention, for the reason that it was irrelevant, incompetent, and immaterial, was overruled. A demurrer was interposed, that the facts stated in the petition of intervention did not constitute a cause of action, and for the further reason that the petitioner had no legal capacity to sue. The demurrer was overruled, to which ruling the appellant excepted, and his exception was allowed. Thereupon said cause proceeded to trial, and, at the conclusion thereof, the court found that, at the time of deceased's death, there was standing to his credit in the Skagit county bank of LaConner the sum of $4,420.50, including the $4,000 claimed by appellant, and after the payment of all just debts and expenses of administration, there remained a balance of $3,145.32, and that said amount did not belong to appellant, but that the same belonged to, and should be turned over to, the state of Washington for the use and benefit of the common school fund; to which appellant excepted, and he now brings the case to this court and asks that the same be reversed, and remanded back to the lower court

with instructions to proceed in accordance with the law of the case.

The errors assigned are, that the court erred, in denying appellant's motion to strike the petition in intervention; in overruling the demurrer to the petition in intervention; in holding the amount of said check to belong to said estate; and in awarding the balance of $3,145.32 to the state of Washington as escheated property. The view we take of the third assignment renders unnecessary a discussion of the first two. It was the opinion of the court, upon which its judgment was based, that the acts shown in the statement of facts did not constitute a gift *mortis causa,* and that the drawing of the check in favor of appellant did not constitute an assignment of the fund in the bank to the extent of the amount of the check. So that we will discuss the case squarely upon the equitable question of whether or not, under the circumstances surrounding the giving of this check, the appellant is entitled to the amount specified in the check.

Under the provisions of the civil law there were three distinct kinds of gifts, all brought within the general definition of *donatio mortis causa;* first, where a person, not *in periculo mortis,* but moved by the general consideration of man's mortality, makes a gift; second, where a person, being moved by fear of present peril, gives so that the subject of the gift is immediately made the property of the donee; and third, where the person, being in peril of death, gives something that shall become the property of the donee only upon the death of the giver. But all modern courts have held that the first two are mere donations, and that such gifts do not properly fall within the definition of *donatio mortis causa,* or within the rules of law governing such a gift. The gifts known to the law as *inter vivos* and *mortis causa* have many essen-

tial elements in common, and the rules of law applicable
to rights under them are frequently applied interchange-
ably, as will be seen by the decisions hereafter quoted.
The principal difference is that a gift *inter vivos* must be
without any conditions attached to it, while a gift *mortis*
*causa* must be made upon the apprehension of death,
which must occur without the revoking of the gift, and
it must be made with the understanding that the gift is
void in case of the giver's recovery. It is now conceded
by all modern authority that every species of personal
property capable of delivery, either constructive or actual,
may be the subject of a gift *mortis causa.*

There is some contention in respondent's brief that the
facts are not exactly as claimed by the appellant. But
an examination of the record convinces us that the state-
ment of appellant is substantially correct; that the de-
ceased, Collins, was of sound and disposing mind; that
no influence whatever was brought to bear upon him; that
the appellant rather discouraged than encouraged the
transaction, having regard for the physical welfare of
his friend; that the check was made at the instance and
request of the deceased; that it was made for the purpose
of assigning his interest in the amount expressed in the
check to his friend; that it was expressly so stated at the
time that that was the intention in making the check; and
that the gift was to be void in case of the recovery of the
deceased.

Many of the old English cases hold that the giving of
a check upon a bank does not constitute an assignment
of the amount deposited in the bank for which the check
is given, and such, no doubt, is the law in ordinary busi-
ness transactions, and is the law of this state, as held
by this court in *Commercial Bank v. Chilberg,* 14 Wash.
247, 44 Pac. 264, 53 Am. St. 873. A large amount of

the business of the country is done through the medium
of banks, and it has not been thought best by the courts
to allow the banks to be made responsible in contests be-
tween the depositor and his creditors.    Therefore the
acceptance of a check was held to be the test of the respon-
sibility of the bank.   But it must be borne in mind that
there is no contest in this case between the donor or his
estate and the donee, or the appellant in this case, and
that there is no contest between the appellant and any
creditors of the estate.    So that, viewed from an equi-
table standpoint, it is the duty of the court to ascertain
what was the intention of the donor in respect to this
alleged assignment of interest, and, when that intention is
ascertained, to give it force and effect.    This distinction
many of the courts have failed to notice, and the rule
that a check on a bank does not constitute an assignment
of the fund is frequently stated as a general proposition,
when an investigation of the case shows that the principle
was announced with reference to a contest which was
waged between creditors of the estate, or other assignees
of the estate, and the donee.    The modern authorities
almost universally hold that the greatest latitude ought
to be given to carry out the expressed intent of the donor,
and that, in cases like the one at bar, where there are no
conflicting interests by creditors or other assignees or
donees of the deceased, the giving of the check is an
assignment of the interest.

    Many of the courts, it seems to us without any suffi-
cient reason, have undertaken to make a distinction be-
tween cases where the check given was for the whole of
the fund, and where it was only for a portion of the fund.
In the case at bar we think it may be justly concluded
that it was the intention of the donor to give to his friend
the whole of his estate.    He evidently did not know

the exact amount that he had in the bank, and, while there were a few hundred dollars over and above the $4,000, he felt that he was going to die soon, and, according to his expressions, as shown by the testimony, it was evidently his intention that all of his fortune should go to the appellant. But, in any event, there seems to be no reason why the giving of the check for a portion of the deposit should not be an assignment *pro tanto* of the deposit. And, recurring again, a moment, to the essential qualifications of the gift, it is true that, in cases of gifts *mortis causa*, there must be a delivery of the thing given, and this is the rock upon which courts have so often split. And it is also true that it must be as nearly an actual delivery to the donee as the circumstances of the case, and the nature and actual position of the donee, and the thing given, will permit. But, in the very nature of business transactions of this kind, this delivery must frequently be constructive. The nature and circumstances surrounding this case necessitated a constructive delivery. The subject of the gift was not available. The decedent did all that was in his power to do to deliver the money in the bank at LaConner to the appellant. So that, in justice and common sense, it seems to us that the delivery was complete, and that the will of the deceased ought not to be thwarted by any technical construction or definition of delivery.

In *Guinan's Appeal*, 70 Conn. 342, 39 Atl. 482, it was held that a delivery of bank books, with intent to vest in the donee the title to the money therein represented, is a sufficient delivery to constitute a valid gift of the money. In this case the deceased, Kate Healy, took the three bank books in question from under her pillow, and gave them to her sister Winifred Miller, and also gave to her the keys to her trunks, which she took

from a small satchel. In giving these articles to Mrs. Miller, Kate Healy said: "Those bank books I give to you, and the keys to my trunks. These are yours, and everything I got belongs to you. If anything happens to me, I want you to have everything." It was found that, at the time this gift was made, the said Kate Healy was in the expectation of immediate death, and under those circumstances the rule was announced as above. It has universally been held that the delivery of a key to a trunk, the contents of which had been given to a donee, in cases of gifts *mortis causa,* is a delivery and an assignment of the contents of the trunk. It might properly be considered, as urged by the appellant in this case, that the giving of the check in this case was equivalent to the giving of a key to a trunk. It was the thing that forced an entrance to the fund which the deceased had on deposit. It was held in *Polley v. Hicks,* 58 Ohio St. 218, 50 N. E. 809, 41 L. R. A. 858, that a delivery to a donee of a deposit book issued by a savings bank, containing entries of deposits to the credit of the donee, with the intention to give the donee the deposits represented by the book, and accompanied with appropriate words of gift, is a sufficient delivery to constitute a valid gift of such deposits, without assignment or transfer in writing. And the court quoted approvingly from *Grover v. Grover,* 24 Pick. 261, where the supreme court of Massachusetts, in answering the objection that no valid gift of a chose in action could be made without assignment, said that:

"'As a good and effectual equitable assignment of a chose in action may be made by parol, and as courts of law take notice of and give effect to such assignments, there seems to be no good foundation for the objection. It is true that the cases, which are numerous, in which such equitable assignments have been supported, are

founded on assignments for a valuable consideration; but there is little, if any, distinction in this respect between contracts and gifts *inter vivos,*—the latter indeed, when made perfect by delivery of the things given, are executed contracts. 2 Kent's Com. (3d ed.) 438. By delivery and acceptance the gift passes,—the gift becomes perfect and is irrevocabl⌐. There is therefore no good reason why property thus acquired should not be protected as fully and effectually as property acquired by purchase. And so we think a gift of a chose in action, provided no claims of creditors interfere to affect its validity, ought to stand on the same footing as sales.' And this is the rule which prevails in the federal courts, and in all of the states in which the question has arisen; and it has been before the court of last resort in many of them."

citing Thornton on Gifts, § 271. Also citing *Camp's Appeal,* 36 Conn. 88, 4 Am. Rep. 39, where it was held that a delivery to a donee of a savings bank book, containing entries of deposits to the credit of the donor, with the intention to give the donee the deposits represented by the book, is a good delivery to constitute a complete gift of such deposits; and that a delivery of a chose in action that would be sufficient to vest an equitable title in a purchaser is sufficient delivery to constitute a valid gift of such chose in action, without a transfer of the legal title. There certainly could be no more virtue in the delivery of a savings bank book to the donee than there is in the delivery of a check to the donee, and there is not as much reason for an assignment of a check as there is for an assignment of the books, because the issuing of the check, the ordering of the payment, authorizes the effect and result which is authorized by an assignment. A delivery of the key of a chest, with words of gift of the chest and its contents, is a good delivery to pass the property to the donee. *Marsh v. Fuller,* 18 N. H. 360. In *Waite v. Grubbe,* 43 Or. 406, 73 Pac. 206, where the father made

a gift of money to the daughter, which money was buried in different places upon the farm, and was not susceptible of an actual manual delivery, and where the father said, "If I should get well, and want some of it, would you let me have it?" and she replied, "Yes, papa, if you get well you can have all of it," a case which in principle resembles very much the case at bar, it was held that the gift was sufficient to convey the property, and the court quotes approvingly, *Blake v. Jones,* 1 Bailey's Eq. 141, 21 Am. Dec. 530, as follows:

"That seems to be regarded as a sufficient delivery which would authorize the donee to take possession without committing a trespass."

The court in that case continues:

"It is not necessary that there be a manual delivery, or an actual transition from hand to hand. The delivery may be constructive or symbolical, but the general rule is that it must be as perfect and complete as the nature of the property and the attendant circumstances and conditions will permit."

And if the delivery in this case could not be made under the circumstances that it was attempted to be made, it could not be made at all, and the will of the deceased would be thwarted. Also citing Thornton on Gifts, § 148, that where the intent to bestow is obvious and clear, and the language and deportment of the donor indicate a belief upon his part that he has done all that is necessary to accomplish his purpose, they come to the aid of the act of delivery, if slight and ambiguous, but not to dispense with it as an essential element of a valid gift. In *Thomas' Admr. v. Lewis,* 89 Va. 1, 15 S. E. 389, 37 Am. St. 848, 18 L. R. A. 170, an elaborately argued case, where the father made gifts *mortis causa* to his two daughters, which gifts were not more explicit than in the case at bar, the court laid down the rule as follows:

"The factum of the gift in this case, being clearly and conclusively proved, as, we think, it indisputably has been, it only remains to state the law and apply it to the facts proved. They show all the essential attributes of constituent elements of a *donatio mortis causa,* as defined by the law and established by the course of adjudication. The gift was made *in periculo mortis,* under the apprehension of death as imminent; and it was of the personal property such as, under the law, may be the subject of a gift *mortis causa.* Possession or delivery was made at the time of the gift; and the donor died of that illness in a few hours after the making of the gift; thus the gift, inchoate, conditional, and defeasible when made, became absolute at the donor's death. Delivery is essential; it may be either actual, by manual tradition of the subject of the gift, or constructive, by delivery of the means of obtaining possession. Constructive delivery is always sufficient when actual, manual delivery is either impracticable or inconvenient;" citing many cases.

In *Kimball v. Leland,* 110 Mass. 325, where A, a depositor in a savings bank, delivered to B her bank book and an order for the payment of the whole deposit, for the purpose of transferring the money to B, held that although B did not present the bank book and order to the bank until after A's death, the transfer to her was complete, as against the next of kin of A, the court saying:

"There being no creditors whose rights could be affected by it, the transfer was equally effectual, whether it was a gift without consideration, or made for a legal consideration."

We cite this case as showing the distinction that is maintained in cases of this kind, where the interests of creditors are involved, and where they are not. "The gift of a savings bank book is in effect a gift of the deposit." *Providence Institution v. Taft,* 14 R. I. 502.

In *Crook v. First Nat. Bank of Baraboo,* 83 Wis. 31,
52 N. W. 1131, 35 Am. St. 17, it was held that
where a depositor addressed the following note to a bank,
"Please let my nephew have the amount of the within
bill," describing the bill, coupled with its delivery so
indorsed to such nephew, with the intention of giving
him the fund in bank, such action operates as a valid
gift of such fund, and justifies the bank in paying it
to such donee on presentation of the writing. This, it
seems to us, was in effect nothing more than a check for
so much money, where no indorsement or assignment
could make it any stronger. In the course of the dis-
cussion of this case the court cited *Basket v. Hassell,*
107 U. S. 614, 2 Sup. Ct. 415, and said:

"The law favors free and comprehensive power of dis-
position by an owner of his property, and the rigor of
the earlier cases has been materially relaxed, both as
to the subjects of such gifts, and as to what will serve
as a delivery to make them effectual. This is well illus-
trated by the cases above cited, in which it is held that
the thing given must be delivered, or it must be placed
in the power of the donee by delivery to him of the means
of obtaining possession;"

citing many cases where it was held that a deposit in
a savings bank may be the subject of a valid *donatio
mortis causa,* as well as of a gift *inter vivos.* It is also
said in this case:

"It is well settled that in order to constitute a valid
assignment of a debt or other chose in action, in equity,
no particular form of words is necessary. Any words
which show an intention of transferring or appropriating
the chose in action to the assignee for a valuable consid-
eration are sufficient; nor is any written instrument re-
quired. Any order, writing, or act which makes an ap-
propriation of the fund amounts to an equitable assign-
ment, and an oral or written declaration may be as
effectual as the most formal instrument."

In *Ellis v. Secor,* 31 Mich. 185, 18 Am. Rep. 178, in sustaining a gift of this kind, it was said:

"The confusion, if any, which is found in some of the text-books is partly due to an attempt to draw unreal distinctions between these and other strictly analogous transactions. They are neither more nor less than a branch of voluntary gifts and settlements; and in the case of choses in action, fall generally under the doctrine of trusts and equitable assignments. The cases are abundant where such transactions have been maintained, where the technical phrase *donatio causa mortis* is not referred to. If there could be any doubt on the subject, it would seem to be, not whether the securities must be delivered, but whether the memorandum of transfer must be delivered. The paper in question here, if actually delivered, would have been a sufficient assignment on its face to pass title, if so intended."

And as showing that the English courts have not uniformly followed this rule, in *Jones v. Lock,* L. R., 1 Ch. App. 25, Lord Cranworth was called upon to determine whether a gift had been completed where a father put a check for nine hundred pounds for a moment into the hands of his son, nine months old, saying, "I give this to baby for himself," and then took it away, and it was found among his assets after his death. He held that in the case before the court there had been no completed gift, but only because, on all the facts before him, he thought the father had no such intention; and he expressly recognized the doctrine that it would have been a valid declaration of trust if so intended. And he declares that all the authorities turn upon that question, whether what has been said was a declaration of trust or an imperfect gift, citing also *Penfold v. Mould,* L. R., 4 Eq. 562, where the court said,

"The same learned vice chancellor reviewed the doctrine very clearly, and declared that any undoubted

expression of intention to pass the property will make the grantor a trustee, although some formalities may be wanting. He declares the case of *Meek v. Kettlewell,* 1 Hare 464, which held a voluntary assignment of a chose in action an imperfect gift, to have been overthrown. He says: 'That decision has been in effect overruled, and it is now held that any instrument may be a sufficient declaration of trust, no form being necessary; the only material question being, "Did the grantor, or did he not, mean at once to pass the property." ' "

"Deceased, while ill and in expectation of death, handed to defendant a savings bank book, saying that, after the payment of the doctor's bill and funeral expenses, the balance of the money was to be equally divided between defendant and his brother and sister. Defendant accepted the bank book, and deceased died the next day. Held, that there was a valid gift *causa mortis.*" *Loucks v. Johnson,* 24 N. Y. Supp. 267.

"A good gift *causa mortis* is shown where it is proved that money on deposit in bank was given to plaintiff, and that the bank book to enable her to get the money was actually delivered to her by the donor, who at the time was in expectation of impending death, and who did die a day or two afterwards." *Walsh v. Bowery Sav. Bank,* 7 N. Y. Supp. 669.

In *May v. Jones,* 87 Iowa 188, 54 N. W. 231, held, that, when the delivery of a check is coupled with an intent to transfer a present interest in the money represented thereby, and no revocation is attempted, the intention of the donor will be given effect, and the transaction be held to transfer a present interest, and a right to the payment of the check after death, as well as before, and that, too, whether it is a mere gift or given for a consideration.

"Where a check was drawn for the full amount of decedent's deposit, under circumstances which showed it was intended as an assignment of the fund, it passed

title of the fund to T." *In re Taylor's Estate,* 154 Pa.
St. 183, 25 Atl. 1061.

To the same effect are, *Dobinson v. Emmons,* 158 Mass.
592, 33 N. E. 706; *Schollmier v. Schoendelen,* 78 Iowa
426, 43 N. W. 282, 16 Am. St. 455; *Ridden v. Thrall,*
125 N. Y. 572, 26 N. E. 627, 21 Am. St. 758, 11 L. R. A.
684; *Gardner v. National City Bank,* 39 Ohio St. 600;
*Coates v. First Nat. Bank,* 91 N. Y. 20; *Smith v. Sands,*
17 Neb. 498, 23 N. W. 356, and a great array of other
cases too numerous to mention.

As showing the view taken by eminent authors on
this subject, we quote from 2 Story's Eq. Jur. (13th ed.)
363, where, after discussing the legal propositions in-
volved, the author says, at § 1044:

"But in cases of this sort the transaction will have a
very different operation in equity. Thus for instance if
A having a debt due to him from B should order it to
be paid to C, the order would amount in equity to an
assignment of the debt and would be enforced in equity
although the debtor had not assented thereto. The same
principle would apply to the case of an assignment of
a part of such debt. In each case a trust would be
created in favor of the equitable assignee on the fund,
and would constitute an equitable lien upon it.

So that, regardless of equitable definitions, or whether
it may be properly termed an assignment or not, if a
trust is created which in equity constitutes an equitable
lien upon the fund, the law vindicates the right of a per-
son to make such disposition of his estate as to him might
seem equitable and just. The same author, in Vol. 1,
§ 607, after discussing some of the cases, says:

"But it may admit of doubt whether the doctrine of
these last cases can now, upon principle, be supported;
for the ground upon which courts of equity now sup-
port donations *mortis causa* is not that a complete prop-

erty in the thing must pass by the delivery, but that it must so far pass by the delivery of the instrument as to give a title to the donee to the assistance of a court of equity to make the donation complete."

Mr. Daniel, in his first volume on Negotiable Instruments, reviewing this question, in § 20, says:

"The doctrine of equitable assignment is the creature of courts of equity, and the phrase 'equitable assignment' is used because, by the technicalities of pleadings at law, no legal assignment can be effectuated. No assent of the debtor is necessary to an assignment of the debt. Notice to him is all that is essential to affect him with liability to respect the assignment, and so far does equity regard the justice of this principle that it is applied even where an integral debt is broken up into fragments. Now, then, if A have $1,000 in the hands of B, and draw a bill directing B to pay $1,000 to C, or order, on demand, there can be no fair inference from the transaction but this: that A intended to assign the debt due to him by B to C, and for the bill to stand in B's hands as evidence of the acquittance. It is the intention to assign that makes the assignment. And after presentment of the bill to B, which is notice, what sound principle of law could be violated, and what equitable right impaired, by holding that an assignment is effected so as to bind the debt in equity, and bind B to respect it  .  .  .  ?"

The same author, in the second volume, § 1643, says:

"We have seen already that a check operates as an assignment of the fund on which it is drawn *pro tanto,* from the very time it is drawn and delivered, as between the drawer and the payee or holder."

And Morse on Banks and Banking, states in § 496 as follows:

"The plain common sense of the holder's rights would seem to be,—That as to the drawer, and those claiming under him otherwise than as bona fide holders for value,

the check is to be sustained as a transfer of the fund against which it is drawn to the amount for which it is written. The same reasons of good faith and security in business transactions which induce the law to sustain a bona fide sale of property, or assignment of bills or notes, against a subsequent assignee in insolvency of the assignor, apply to the case of a check."

Believing that not only the overwhelming weight of authority, but the overwhelming weight of reason, is in favor of sustaining a gift *mortis causa*, at least in a case like the one at bar, where there is no controversy with creditors or subsequent donees or assignees of the donor, the judgment will be reversed, and the court instructed to render judgment for the amount in the bank, over and above the expenses of the administration, in favor of appellant.

FULLERTON, C. J., and ANDERS, MOUNT, and HADLEY, JJ., concur.