[No. 14182-1-I. Division One. December 27, 1984.]

EDWARD P. MCCARTON, *Appellant*, v. THE ESTATE OF OLGA V. WATSON, *Respondent*.

*Appelwick, Trickey & Sluiter, Marlin J. Appelwick,* and *Nancy Bradburn–Johnson,* for appellant.

*Kempton & Gossard* and *David Gossard,* for respondent.

COLEMAN, J.—Edward P. McCarton appeals from an order of the Superior Court dismissing his complaint against the estate of Olga V. Watson. He contends that the decedent, Olga Watson, transferred certain personal property to him as a donee and a trustee for others of a gift causa mortis.

During 1980, Mr. McCarton managed the apartment building where Olga Watson resided. Mrs. Watson's health was deteriorating, and she eventually began to call on Mr. McCarton for assistance in her daily affairs. By 1982, Mrs. Watson's health had deteriorated to the point where she could no longer care for herself. Mr. McCarton arranged for her to move into his apartment, and he also moved some of

her furniture into an empty apartment across the hall. While living with Mr. McCarton, Mrs. Watson mentioned to several people that she wanted her money to stay in America because she believed that the money should stay in the country where it was made. She also remarked to the effect that she wanted her money to go to a "living family", *i.e.*, one with children, so that the assets could pass from generation to generation.

Except for a brief stay in a nursing home, Mrs. Watson lived in Mr. McCarton's apartment until her death. During the stay in the nursing home she met Mr. McCarton's nephew and his parents, Patrick and Rosella Phalen. She took a liking to the young nephew and nicknamed him "Champion."

Mrs. Watson subsequently moved back to Mr. McCarton's apartment. Her health continued to deteriorate, however, and approximately 2 days before her death, she stated that she realized she was dying. She then asked Mr. McCarton to procure a power of attorney so that he could manage her financial affairs. She also told Mr. McCarton and others that she wanted him to have her furniture and the contents of the furniture if anything happened to her.

Mr. McCarton obtained a power of attorney form from an attorney in the apartment building and had it executed by Mrs. Watson. Despite her objection that she knew what the document was and the power it conferred on Mr. McCarton, Mr. McCarton read the power of attorney to Mrs. Watson. She then affixed her signature, as did a witness, Tony.

On July 26, 1981, 2 days before her death, Mrs. Watson told a friend of Mr. McCarton's, MarJean, that she was very tired and wanted her affairs ordered before she died. She asked MarJean if she thought she was dying. When Mr. McCarton entered the room, Mrs. Watson asked him to write down her wishes for the disposition of her assets. She directed that Mr. McCarton receive her stocks and bonds (subsequently valued at $235,600); that her sister, Berta, receive the bank account at Washington Mutual (subse-

quently valued at $108,000); and that the children of Patrick and Rosella Phalen receive the remainder of her accounts (subsequently valued at $246,000) in the form of a trust to be used for formal education and cystic fibrosis expenses. She further directed that this fund be administered by Edward P. McCarton.

Mr. McCarton then read his transcription of Mrs. Watson's wishes to her, and she replied that the document was fine. MarJean, who witnessed this transaction, read the document to Mrs. Watson a second time, and Mrs. Watson replied, "That's fine." In response to Mr. McCarton's question asking if she was able to sign the document, Mrs. Watson shook her head and said, "No." The document was then signed by Mr. McCarton and MarJean in Mrs. Watson's presence.

Though it is unclear from the record precisely where the subject matter property was located, it was established that the stock certificates and bank books were either in Mr. McCarton's apartment, or in apartment 110 across the hall. Mrs. Watson was not physically in possession of these documents, and she did not hand them over to Mr. McCarton or direct him to retrieve them and bring them to her. When Mrs. Watson gave her instructions relating to the stock certificates, she said, "You know where they are," or "There they are." There was testimony that Mr. McCarton responded by nodding affirmatively.

On the evening of July 27, 1981, Mrs. Watson began suffering respiratory problems and was taken to Providence Hospital. She died in the early morning hours of July 28.

Although not discovered until after the trial, Mrs. Watson had prepared a will some years before her death. This will has now been admitted to probate. Under the terms of the will, one–half of her estate was left to her sister, Berta. The other half was left to Berta's middle–aged adopted nephew, Herbert Gansloser. The will also contained bequests of personal property to a church, with instructions that the property be given to needy people. There was testimony at trial that, prior to her last illness, Olga received a

letter from her adopted nephew, Herbert Gansloser, demanding his American inheritance from her. Mrs. Watson appeared angered, and on one occasion told Tony that "he [Herbert] won't get a dime from me."

Following trial the Superior Court entered findings of fact and conclusions of law which in pertinent part provided as follows:

### FINDINGS OF FACT

11. That the Petitioner, Edward McCarton, and the witness on behalf of Petitioner, to–wit, Anthony Franklin did assist said deceased from October or November of 1981 until her death on July 28, 1982 by providing her basic needs in that they shopped for her groceries, cleaned her room, and engaged in social intercourse, and in addition, made arrangements for medical, hospital, and nursing home assistance and care, and generally looking out for her health and welfare. That during this period of time the deceased became very grateful and appreciative of the assistance rendered to her by the Petitioner and the above–named witnesses.

12. That on a number of occasions, the deceased expressed her gratitude and indicated that she wanted her property and assets to go to Petitioner.

13. That on or about July 25, 1982, the deceased, being bedridden and in increasing declining health, executed a general power of attorney appointing Edward McCarton as her attorney–in–fact (Petitioner's Exhibit No. 1). Said power of attorney was witnessed by Anthony Franklin.

14. That on or about July 26, 1982, the deceased expressing a fear that she was about to die told Petitioner in the presence of MarJean Jordan the manner in which she wished to dispose of her property. Petitioner wrote down her expressed intentions, and said writing was signed and witnessed by MarJean Jordan (Petitioner's Exhibit No. 2).

15. There was insufficient evidence of a delivery of the assets Petitioner alleges was [sic] given to him other than MarJean Jordan testifying that she saw what she believed to be stock certificates in an envelope in Petitioner's office at that time deceased's intent was expressed. In addition, certificates were found in a chest of drawers which had been removed from the decedent's room prior to her death to a spare room for safekeeping.

There was no specific testimony or evidence relating to the gifts of the bank accounts or other personal effects of the decedent.

. . .

## CONCLUSIONS OF LAW

2. There is insufficient evidence that the deceased had done anything other than express a donative intent, and that there was insufficient delivery.

3. The motion by the estate at the close of the Petitioner's case challenging the sufficiency of the Petitioner's evidence should be granted.

. . .

■ Under Washington law, a gift causa mortis is established when: (1) a gift is made in apprehension of approaching death from some existing sickness or peril; (2) the donor dies from such sickness or peril without having revoked the gift; (3) there is actual, constructive, or symbolical delivery of the gift to the donee or to someone for him; and (4) the evidence reveals the donor's present intent to pass title to the gift. *In re Estate of McDonald,* 60 Wn.2d 452, 454, 374 P.2d 365 (1962); *In re Estate of White,* 129 Wash. 544, 546, 225 P. 415 (1924); *Phinney v. State,* 36 Wash. 236, 247, 78 P. 927 (1904).

■ The pivotal issue in this case is whether there is sufficient evidence of delivery. The delivery rule has long been considered a safeguard against the possibility of fraud, undue influence and perjury in gifts causa mortis. *MacKenzie v. Steeves,* 98 Wash. 17, 167 P. 50 (1917); *see generally Whitney v. Canadian Bank of Commerce,* 232 Or. 1, 374 P.2d 441 (1962); *Scherer v. Hyland,* 75 N.J. 127, 380 A.2d 698 (1977). In general, early courts considering the issue of delivery followed either a "possessory" or "evidentiary" theory of delivery. *Whitney,* 374 P.2d at 444. The possessory theory requires a manual delivery of the subject of the gift. On the other hand, the evidentiary theory allows for a constructive, or less than actual delivery of the gift item. Commenting on the element of delivery, the *Phinney* court quoted approvingly from *Blake v. Jones,* 8 S.C. Eq. (Bail. Eq.) *141 (1830):

"That seems to be regarded as a sufficient delivery which would authorize the donee to take possession without committing a trespass."

The court in that case continues:

"It is not necessary that there be a manual delivery or an actual transition from hand to hand. The delivery may be constructive or symbolical, but the general rule is that it must be as perfect and complete as the nature of the property and the attendant circumstances and conditions will permit."

*Phinney,* at 246. In another case, the Washington Supreme Court stated:

Many years ago the rule of law in this respect was exceedingly strict and harsh, but it has now been softened so that only such delivery is required as the nature of the thing given and the circumstances under which it is given will permit, and so it is very generally held that the thing given may be delivered direct to the donee, or to some designated person for him, and the delivery may be either actual, constructive or symbolical.

*In re Estate of White,* 129 Wash. 544, 547, 225 P. 415 (1924). The rule is reiterated in *In re Estate of Gallinger,* 31 Wn.2d 823, 829, 199 P.2d 575 (1948).

"A gift will not be presumed, but he who asserts title by this means must prove by evidence which is clear, convincing, strong and satisfactory a clear and unmistakable intention on the part of the donor to make a gift of his property, and the delivery of the property must be as perfect as the nature of the property and the circumstances and surroundings of the parties will reasonably permit.

(Quoting trial court's memorandum opinion.) With respect to this latter statement, we note that testimony on the essential elements of a gift causa mortis must be clear and convincing, "but need not be beyond dispute or doubt." *In re Estate of White, supra* at 547.

■ In shifting the judicial focus from manual or possessory delivery to the circumstances surrounding delivery of the gift, courts have paid increasing attention to the donor's intent to deliver. *Whitney v. Canadian Bank of*

*Commerce,* 374 P.2d at 448–49; *MacKenzie v. Steeves, supra* at 21–23. The *MacKenzie* court stated:

There is much discussion in the books, but it is the common holding of the courts that, where the intent to bestow is obvious and clear and there is no evidence of fraud or undue influence, and the circumstances show that the donor has done all that, in his opinion, is necessary to do to accomplish his purpose, the intent of the donor will answer for the act of delivery.

*MacKenzie,* at 23. The court also quoted W. Thornton, *Gifts and Advancements* § 145 (1893):

"Not only is the application of the rule requiring a delivery to be mitigated and applied according to the situation of the subject of the gift, but the conditions and intention of the donor at the time of making the gift must be considered; and this is especially true of a gift *causa mortis.* 'The intention of the donor,' says the Supreme Court of Indiana, 'in peril of death, when clearly ascertained and fairly consummated, within the meaning of well established rules, is not to be thwarted by a narrow and illiberal construction of what may have been intended for and deemed by him a sufficient delivery. The rule which requires delivery of the subject of the gift is not to be enforced arbitrarily.'"

*MacKenzie,* at 22. Thus, the donor's intent to deliver and his belief that he has successfully delivered the gift may, in certain circumstances, validate an otherwise less than perfect delivery. This is in keeping with the general rule that delivery by the donor, and possession by the donee, need only be as complete and perfect as the nature of the property and the circumstances and conditions permit. *Newsome v. Allen,* 86 Wash. 678, 683, 151 P. 111 (1915).

In the present case, respondent argues that the purported delivery was not as perfect as the conditions and circumstances permitted because: (1) all of the relevant gift items were nearby when Mrs. Watson recited her gift instructions; (2) all of these items were capable of manual delivery; (3) and though Mrs. Watson was weak, she could have asked the appellant to bring the items to her and then complete a manual delivery.

In this regard, respondent argues that *Newsome v. Allen, supra,* is analogous and therefore controlling. *Newsome,* however, is distinguishable. In that case, the donor and donee went to a safe deposit box to examine certain certificates and securities. They took the gift items to a booth, examined them, and then returned them to the vault. In the presence of the bank manager, the donor, who was going to the hospital for an operation, said the following: "'In case I don't come back, the contents . . . *are to be delivered* . . . to Mrs. Allen and my sister.'" *Newsome,* at 683. The donor then put the keys to the safe deposit box on the counter and said to the donee, "'Kate, here are the keys; in case I don't come back you know what to do.'"

In finding an insufficient actual or constructive delivery of the gift, the court noted that the conditions and circumstances were such that the gift items could have been delivered into the actual possession of the donee. Moreover, any present intent to deliver was equivocal in light of (1) the fact that the contents of the box *were to be delivered,* and (2) the fact that the box was held in partnership by the donor and her sisters.

The circumstances and conditions surrounding the gift in the present case were very different. First, unlike the donor in *Newsome,* the donor in this case was incapacitated and near death. Mrs. Watson was physically incapable of collecting the gift items and delivering them to Mr. McCarton. Second, Mrs. Watson and Mr. McCarton did not sit down together and examine the gift items at the time she expressed her intent to make the gift. Had they done so, the circumstances and conditions would have permitted a more perfect (*i.e.,* manual) delivery. Finally, there was nothing equivocal about Mrs. Watson's present intent to make the gift. She clearly relinquished her ownership and control of the gift items and vested such ownership and control in Mr. McCarton.

Respondent also relies on *Dingley v. Robinson,* 149 Wash. 301, 270 P. 1018 (1928). The alleged donor in *Dingley* arranged for herself and her son to each have a key to a

safe deposit box containing stocks and bonds. The son's wife testified that the mother told the son "'all of the property is in the deposit box in your name, you have the key and it is yours.'" *Dingley,* at 304. After the mother died, the son went to the box and removed the gift items.

The court disallowed the gift because, among other things, there was insufficient evidence of delivery. Instead of focusing on the donor's ability to achieve a more perfect delivery, the *Dingley* court focused on the son's failure to exercise dominion over the gift items until after the donor's death. However, a careful reading of the decision reveals that the court questioned whether the mother intended to make a present gift. There was evidence that the mother had written a letter to her daughter indicating that she expected to survive the operation. *Dingley,* at 304. Thus, the relatively weak evidence of donative intent apparently prompted the court to require a stronger showing with respect to delivery. Since delivery and donee possession may, depending on the circumstances, be actual or constructive, the *Dingley* decision is best understood as a proper balancing of intent and other factors relevant to the question of delivery. This balancing approach

> takes into account the purposes served by the requirement of delivery in determining whether that requirement has been met. It would find a constructive delivery adequate to support the gift when the evidence of donative intent is concrete and undisputed, when there is every indication that the donor intended to make a present transfer of the subject–matter of the gift, and when the steps taken by the donor to effect such a transfer must have been deemed by the donor as sufficient to pass the donor's interest to the donee. . . . [T]his approach . . . reflects the realities which attend transfers of this kind.

*Scherer v. Hyland,* 75 N.J. 127, 133, 380 A.2d 698, 701 (1977).

In the instant case, Mrs. Watson's instructions, which were transcribed and witnessed, were clear and unequivocal. The language indicated a present intent to transfer the

gift items. In fact, her instructions were consistent with statements made on earlier occasions concerning how she wished to dispose of her estate. Given such concrete and unequivocal evidence of intent, we think the constructive delivery and constructive donee possession were sufficient in this case to transfer the gifts.

The estate argues, however, that there was an insufficient specification of the subject property. The testimony throughout the record indicates that Mrs. Watson at all times was mentally alert and competent. There is nothing to indicate that she was unaware of the nature of her property. She was specific with respect to the stocks and bonds. She was specific with respect to the Washington Mutual account, and she was specific in indicating that all other accounts were to be placed in trust and administered for the benefit of the children of the Phalens. Under these circumstances, we think that the subject matter of the purported gift was sufficiently identified; that present intent to make a gift was clearly expressed; that Mrs. Watson believed that the power of attorney granted to appellant would divest her control and ownership of the gift items; that Mrs. Watson's condition was such that she could not manually deliver the gift items to Mr. McCarton; that Mr. McCarton, by virtue of his power of attorney, was in constructive possession of the gift items; that Mr. McCarton's constructive possession is supported by the fact that he had access to the stock certificates and the bank books at all critical times; and that he, therefore, takes as donee for himself and as trustee acting for Mrs. Watson's sister and the Phalen children. The fact that he did not take steps to transfer the stock certificates or transfer the moneys prior to Mrs. Watson's death is not critical under the facts of this case because Mrs. Watson died within a very short period following her illness.

Courts must scrutinize such transactions carefully and judge each case on its own facts. An individual's wishes regarding the disposition of property should be respected unless there are facts bringing into question the existence

of intent. There are no allegations of fraud or undue influence in this case. The sole question is whether there was sufficient delivery of a gift causa mortis.

We conclude that the constructive delivery here was as perfect and complete as the attendant circumstances and conditions permitted. Mrs. Watson felt she had done all that was necessary to accomplish her stated purpose. She inquired of Mr. McCarton as to his knowledge of where the items were. Upon his affirmative indication that he knew where the items were, the manifestation of intent and constructive delivery was complete.

For the reasons stated, the judgment of the trial court is reversed and the cause remanded to the superior court for further proceedings consistent with this opinion.

DURHAM, C.J., and SWANSON, J., concur.